[L. A. No. 5231.    Department Two.—September 8, 1919.]

GEORGE T. MAHANA et al., Respondents, v. ECHO PUB-LISHING COMPANY (a Corporation), Appellant.

[1] LIBEL—ESTOPPEL—PLEADING.—In an action for libel, the failure of the defendant to plead that the plaintiffs were estopped from asserting that they were injured by the publication because the false information had been obtained through the agent of the plaintiffs made the defense unavailable.

[2] ID.—FALSE STATEMENT CONCERNING CANCELLATION NOTICES OF INSURANCE POLICIES—EXCESSIVE DAMAGES.—In an action by insurance agents for the publication of a statement that policy-holders who had taken out policies through them had been "somewhat mystified" by the receipt of cancellation notices for paid for policies, indicating that some financial tangle had arisen whereby they would be losers, a verdict for one thousand five hundred dollars, reduced by the court to one thousand dollars, was grossly excessive, where it was obvious, if plaintiffs were injured, the dishonesty of their local representative must have done more to bring about that result than the publication.

[3] ID.—FALSE STATEMENT NOT LIBELOUS PER SE.—The publication of a false statement that policy-holders had been "somewhat mystified" by the receipt of cancellation notices for paid for policies was not libelous *per se*, and an elaborate innuendo in the complaint did not make it so.

[4] ID.—INNUENDO—WHEN INEFFECTIVE.—Unless the article was of such a nature that in view of extrinsic facts alleged and proved it conveyed to the readers of the publication charges of dishonesty and financial irresponsibility of plaintiffs, the innuendo will not give it that sinister significance.

APPEAL from a judgment of the Superior Court of Kern County.  J. W. Mahon, Judge.  Reversed.

The facts are stated in the opinion of the court.

Wiley & Lambert and W. W. Kaye for Appellant.

Duke Stone and Rowen Irwin for Respondents.

MELVIN, J.—Plaintiffs, who are copartners, were awarded one thousand five hundred dollars damages for an alleged libel.  This verdict was reduced by the court to one thousand dollars.  Defendant appeals from the judgment.

Mahana and Cooling were general agents for the Western Indemnity Company.  The principal place of business of the copartnership was in Los Angeles.  They had an agent at Bakersfield, one H. E. Weymouth.  The defendant corporation publishes "The Morning Echo," a newspaper of general circulation in Kern County and other counties in the state.  On the morning of August ·8, 1915, the following article, which is the basis of this suit, appeared in the said newspaper:

"Notices Mystify Policy Holders.

"Bakersfield policy holders of the Western Indemnity Com-. pany have been somewhat mystified during the past few days by the receipt of cancellation notices for paid for policies, indicating that some kind of a financial tangle has arisen whereby they will be the losers.  The cancellation notices have been sent out by Mahana & Cooling, F. E. Sherk, agent, Los Angeles.

"Col. H. E. Weymouth, who had charge of the Bakersfield office of the company, left the city several days ago and it is reported that the insurance people have been endeavoring to locate him.  It is said that premiums amounting to several hundred dollars, perhaps over $1000.00, have been involved in the investigation of the special agents of the insurance company.

"Colonel Weymouth, for several months in charge of the insurance department conducted by McManus & Son, real estate agents, opened an agency for himself in a location under the postoffice about six months ago.  He was a hail-fellow-well-met and popular with the men about town."

That the part of the article following the first paragraph was substantially correct seems to be conceded by plaintiffs. Their representative had left the city a few days before the publication, and premiums amounting to several hundred dollars were involved in the investigation by special agents of the indemnity company, sent to learn the truth about Weymouth's peculations.

The part of the article, therefore, upon which the judgment must be supported, if at all, is that charging that plaintiffs had sent out cancellation notices for paid policies. It is admitted by appellant that at the time of the publication of the article no such notices had been sent out. Plaintiffs admit that "in two or three instances *after* the publication of the article the plaintiffs did cancel policies on account of not having received the premium, and when they found that their agent had collected the premium, in every instance the policies were reinstated."

Appellant's first contention is that plaintiffs were estopped by the conduct of their agent from complaining of the publication of the supposed fact that cancellation notices had been sent out. There was testimony to the effect that one of defendant's reporters who had a policy of insurance issued by the Western Indemnity Company had received a notice a few days before the publication of the article in the "Echo" to the effect that if his premium should not be promptly paid his policy would be canceled. He showed this letter to Mr. Sinclair, a local agent who had been representing plaintiffs after Weymouth's departure. According to the testimony of Mr. Gill, the reporter, Mr. Sinclair said: "There's a lot more of them have had their policies canceled and will have them canceled."

Mr. Sinclair denied any recollection of such a remark but admitted that when Mr. Gill spoke of the cancellation of his policy a Miss Meyer, who was present, said: "Yes, one of my policies has been canceled, too." He also said that neither he nor Miss Meyer explained that her policy had not been issued by the Western Indemnity Company. Acting upon the information received from Mr. Sinclair and Miss Meyer, the reporter wrote that part of the article relating to cancellations, and appellant insists that the false information having been obtained through the agent of respondents, or in his presence, the plaintiffs are estopped from asserting

that they were injured by its publication.  Respondents answer that estoppel was not pleaded, and deny that the introduction of the evidence at the trial waived such pleading, because the matter was properly introduced not to show estoppel but good faith on the part of the publisher.  This position is well taken.  **[1]** The failure to plead estoppel makes that defense unavailable now.

**[2]** But the judgment must be reversed because the amount of damages is grossly excessive.  If plaintiffs were injured in their business in and around Bakersfield, it is obvious that the dishonesty of their local representative must have done more to bring about that result than the mere erroneous statement that policies upon which the premiums were paid had been canceled—a statement which would have been true if made a few days later.  Therefore, the judgment, even if it have any basis in the false statement regarding the cancellation notices, is too large.

When they became suspicious of Weymouth, plaintiffs sent to Bakersfield agents who interviewed many holders of policies issued by the Western Indemnity Company, so that they might learn the extent of Weymouth's embezzlements.  They must have known that such a course would probably result in the publication of the story of his dishonesty.  They must have been aware that such publication would result in temporary diminution of their local business, but they must have known also that the printing of the facts about Weymouth's crimes would not be libelous.  The offense was one committed not only against his employers but against the people of the state, hence the publication was a matter of interest to every citizen.  **[3]** The false statement that policy-holders had been ''somewhat mystified'' by the receipt of ''cancellation notices for paid for policies'' was not libelous *per se,* and the elaborate innuendo of the complaint does not make it a libel.  An insurance company that has not received the premiums due on a policy may usually give notice that unless the amount due is promptly remitted the policy will be annulled, and there was nothing to show that the notices indicated by the article would be different from those ordinarily sent to delinquent policy-holders.  There was nothing in the published article which would convey to the reader the idea that plaintiffs intended to profit by the rascality of Weymouth by the actual cancellation of policies for which the

holders had paid the premiums to him, unless such implication is to be found in the words "indicating that some kind of a financial tangle has arisen whereby they will be the losers." But these words do not necessarily imply either sinister motives of the agents or that the loss would be of the amount paid on the policies. A policy-holder would be to some extent a loser if compelled to go to the trouble and expense of proving that as a matter of fact he had paid a premium which had been embezzled by the agent of the insuring company. A cancellation notice coming to a man who owed nothing to the insurance carrier would naturally mystify him and would indicate that some kind of a financial tangle had arisen. The words are not libelous *per se,* and there is nothing in the record to indicate that by the printing of the article defendant conveyed to the public the idea that Western Indemnity Company and plaintiffs "were in bad financial condition and were not responsible under their policies, and were dishonest in their dealings with policy-holders, and in general were unreliable."

[4] Unless the article was of such a nature that in view of extrinsic facts alleged and proved it conveyed to the readers of the newspaper charges of dishonesty and financial irresponsibility of plaintiffs, of course the innuendo will not give it that sinister significance. (*Mellen* v. *Times-Mirror Co.,* 167 Cal. 587, [Ann. Cas. 1915C, 766, 140 Pac. 277].) We find nothing in the record which shows that the statements in the article were understood in any sense beyond their literal import.

We are of the opinion that the portion of the publication which was false is not libelous and has no tendency to hold plaintiffs up to shame or to injure them in their business. In this connection it is to be noted that the insurance company is not a plaintiff. If any losses were to fall upon policy-holders the repudiation of liability would necessarily be that of the insurer. The insinuation that those receiving cancellation notices might be "losers" is, therefore, one which in the most serious aspect would be injurious to the insurer rather than to the agents.

The judgment is reversed.

Wilbur, J., and Lennon, J., concurred.