[Civ. No. 7635. Fourth Dist., Div. One. Feb. 1, 1966.]

N. C. ROBERTS COMPANY, Plaintiff and Appellant, v. TOPAZ TRANSFORMER PRODUCTS, INC., et al., Defendants and Respondents.

[Civ. No. 7636. Fourth Dist., Div. One. Feb. 1, 1966.]

LEGLER BENBOUGH, Plaintiff and Appellant, v. TOPAZ TRANSFORMER PRODUCTS, INC., et al., Defendants and Respondents.

[Civ. No. 7637. Fourth Dist., Div. One. Feb. 1, 1966.]

DAVID MONROE SELLGREN, Plaintiff and Appellant. v. TOPAZ TRANSFORMER PRODUCTS, INC., et al., Defendants and Respondents.

[Civ. No. 7638. Fourth Dist., Div. One. Feb. 1, 1966.]

EDWARD UHL, Plaintiff and Appellant, v. TOPAZ TRANSFORMER PRODUCTS, INC., et al., Defendants and Respondents.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

[Civ. No. 7639. Fourth Dist., Div. One. Feb. 1, 1966.]

OTTO A. GERTH, Plaintiff and Appellant, v. TOPAZ TRANSFORMER PRODUCTS, INC., et al., Defendants and Respondents.

[Civ. No. 7640. Fourth Dist., Div. One. Feb. 1, 1966.]

ARMISTEAD B. CARTER, Plaintiff and Appellant, v. TOPAZ TRANSFORMER PRODUCTS, INC., et al., Defendants and Respondents.

Civ. No. 7641. Fourth Dist., Div. One. Feb. 1, 1966.]

JOHN E. LUCAS, Plaintiff and Appellant, v. TOPAZ TRANSFORMER PRODUCTS, INC., et al., Defendants and Respondents.

[Civ. No. 7642. Fourth Dist., Div. One. Feb. 1, 1966.]

I. NORMAN LAWSON, Plaintiff and Appellant, v. TOPAZ TRANSFORMER PRODUCTS, INC., et al., Defendants and Respondents.

(Consolidated Cases.)

804

Augustine & Bryans and Don Augustine for Plaintiffs and Appellants.

Procopio, Price & Cory and John H. Barrett for Defendants and Respondents.

WHELAN, J.—Eight different plaintiffs (appellants) have taken appeals in their separate actions from a single judgment.

The defendants in the eight actions were Topaz Transformer Products, Inc., a corporation (Topaz) and Robert L. McLoughlin and William D. Campbell, identified hereafter. The eight actions were consolidated for trial with an action for declaratory relief (No. 273044) in which Topaz, McLoughlin, Campbell and others were plaintiffs and the eight appellants were defendants.

As was proper, a single set of findings was made and a single judgment entered covering all nine actions. (*Stanton* v. *Superior Court*, 202 Cal. 478 [261 P. 1001]; *Bechtold* v. *Bishop & Co., Inc.*, 16 Cal.2d 285 [195 P.2d 984].) No appeal was filed in action No. 273044.

Each appellant was the owner of preferred and common stock of Topaz, of which in all they owned 5,950 preferred shares and 2,975 common shares. (Common shares represented by certificates outstanding at the time of commencement of the action will be referred to as "reissued new common" when necessary to distinguish them from shares represented by certificates issued earlier, which will be called "new common.") Each appellant sought to recover his investment in the preferred shares only, upon the ground that the preferred shares were void and worthless as having been issued in violation of the conditions of the permit under which they were issued. Each sought, however, to retain his shares of reissued new common stock. Their actions were filed on January 8, 1963.

Action No. 273044, filed on March 20, 1963, sought a deter-

mination of the validity of the preferred and common stock, both of which the complaint alleged were valid. All owners, other than appellants, of preferred and common shares joined Topaz as plaintiffs. Seven had obtained their shares under the same conditions as appellants. The number of preferred shares owned by them was 4,050; of reissued new common, in excess of 35,000.

Topaz was incorporated under California law in 1957. Its authorized capital was $25,000, consisting of 25,000 shares of common stock with a par value of $1.00 each (old common).

On September 19, 1957, the Commissioner of Corporations authorized the sale and issuance of 30 shares of old common, of which in February of 1960 McLoughlin and Campbell held 15 shares each.

Prior to February 16, 1960, Topaz authorized an amendment to its articles of incorporation to create a class of preferred stock with a $10 par value per share, and to replace the original provision for common shares with one creating 50,000 shares of common without par value (new common), and permit the conversion of 10,000 shares of preferred for 10,000 shares of new common.

On that date, application was made to the Commissioner of Corporations for a permit to issue 40,000 of the proposed new common in exchange for the outstanding 30 shares of old common at the rate of 1,333⅓ shares of new for one share of old; to sell each of 10,000 shares of preferred for $10 cash net.

On March 4, 1960, a permit was issued authorizing the sale and issuance of the securities as requested, subject to certain conditions, which were: The by-laws were to be amended in the manner authorized (which was done on March 17, 1960); 10,000 shares of new common were to be issued to the holders of the old, which was first to be surrendered to Topaz and cancelled; after the 40,000 shares of the new common had been issued, the 10,000 shares of preferred might be sold to the persons named in the application, which included all but one of the appellants.

Following that part which authorized the sale and issue of shares as outlined (paragraphs 1, 2 and 3 of the permit), the permit stated: ''This permit is issued upon the following conditions:

''.   .   .   .   .   .   .   .   .   .   .

'' (c) That none of the securities authorized by paragraphs 1, 2 and 3 hereof shall be sold or issued unless and until the applicant first shall have selected an escrow holder and said

escrow holder shall have been first approved in writing by the Commissioner of Corporations; that when issued all documents evidencing any of said securities shall be forthwith deposited with said escrow holder, to be held as an escrow pending the further written order of the said Commissioner; that the receipt of said escrow holder for said documents shall be filed with said Commissioner; and that the owner or persons entitled to said securities shall not consummate a sale or transfer of said securities, or any interest therein, or receive any consideration therefor, until the written consent of said Commissioner shall have been obtained so to do.''

The named persons to whom preference shares might be sold included Norman C. Roberts Company (Roberts) and six other appellants whose names had been furnished by Roberts as the result of a proposal made by David Sellgren on behalf of Roberts for the financing needed by Topaz. An amended permit issued May 17, 1960, added other names.

Roberts was an underwriter and dealer in securities and a member of the New York Stock Exchange.

On March 18, Topaz and Roberts signed an agreement under which Roberts was to receive $5,000 for advising Topaz as to income and marketing of securities for five years; by a second agreement, McLoughlin and Campbell gave Roberts the right to buy 10 percent of their common stock should they make a public offering of it; in a third contract, executed at the same time, stated to be for the benefit of all those who might become holders of preferred shares, McLoughlin and Campbell agreed to give Roberts proxies on sufficient shares to elect a member of the board of directors. The $5,000 fee was paid to Roberts in two instalments on April 27 and August 16, 1960.

On March 24, 1960, Roberts informed McLoughlin and Campbell that Roberts and its clients would not purchase the issue of preference shares and that McLoughlin and Campbell had three alternatives: (1) To sue Roberts; (2) get financing elsewhere; or (3) give the prospective investors a greater share of the corporation.

McLoughlin and Campbell concluded that they had no possible choice but to make 5,000 of their new common shares available to the prospective purchasers of preferred shares on the basis of one ''bonus'' common share for each two preferred shares purchased. This was accomplished by an agreement to transfer the 5,000 shares to Roberts' attorney for two cents on March 28, 1960.

The minutes of a meeting of the board of Topaz on March 28, 1960, spoke of the personal holdings of all the presently outstanding common stock of the corporation (being 40,000 shares) of McLoughlin and Campbell.

Shares of preferred and new common were issued on various dates from March 31 through August 1, 1960, when the sale of all the preferred shares was completed to Roberts and its clients, each of whom received new common in the ratio of one to two of preferred.

The funds from the sale of the preferred shares were transmitted to the escrow holder, the preferred shares issued, the certificates therefor retained in escrow, and a deposit receipt issued. However, the documents (stock certificates) evidencing the "bonus shares" were not held in escrow but were delivered to the preferred purchasers.

In each instance, the certificate for the new common shares and a receipt showing the holding in escrow of the preferred shares were transmitted by the escrow agent to the attorney who was then acting for Roberts.

Certificates for new common were issued also to McLoughlin and Campbell, and to other persons in addition to the clients of Roberts. No consideration was paid to the corporation for the transfers to persons other than McLoughlin and Campbell.

In July of 1961, when the Commissioner of Corporations brought the fact to their attention, the officers of Topaz and its attorney, who was the approved escrow agent, first became aware that the new common stock certificates should not have left the hands of the escrow holder.

Topaz then asked the commissioner for a suggested solution. The plan adopted involved recalling all the new common shares.

On September 22, 1961, a letter requesting return of the certificates for new common was sent to all holders thereof by the escrow agent. It gave information that the permit to issue the stock contained an escrow provision; that only the preferred stock had been issued in escrow; and that application would be made to the commissioner to reissue the common shares in escrow.

All holders of certificates for new common stock returned them to the escrow agent [1] before the end of December of 1961.

---

[1]There was one exception: A shareholder had lost his stock certificate and furnished satisfactory evidence to that effect. That exception is noted in the application to reissue the shares, in the pleadings in action No. 273044, and in the court's findings of fact.

On January 22, 1962, an application for reissue of the new common shares, in escrow, was filed with the commissioner. The application alleged: "By inadvertence, the escrow holder issued the certificates for the shares of common stock directly to the share owners, and not in escrow. When this inadvertence was discovered some sixteen months later, the company proceeded to recover to itself from the holders of shares of common stock all the certificates which had been inadvertently issued, and the company now holds in its possession all the said certificates issued . . ."

"The company now desires to issue in escrow certificates of the company's common shares to the owners of said shares in cancellation of the obligation and indebtedness of the company to said share owners by reason of the recovery from them of the certificates originally issued. All the holders of shares of common stock have been advised of the reason for the procedure which has been and is being conducted, and all have willingly co-operated by forwarding their certificates to the company." All holders of certificates for such shares were listed, with the number of shares issued to each. A permit issued April 6, 1962, authorizing Topaz: "To issue an aggregate of not to exceed 40,000 shares of its common stock to any or all of the holders of record of its formerly issued and outstanding capital stock immediately prior to the effectiveness of the amendment of its Articles of Incorporation referred to and described in its application filed with the Commissioner of Corporations on February 15, 1960, or to their successors in interest in said shares, in exchange therefor on the basis of 1,333⅓ shares of its common stock, as provided by said amendment, for each share of formerly outstanding capital stock."

On April 12, 1962, appellants, by letter, demanded from Topaz the return of their respective investments with additional damages. The letter stated that the Commissioner of Corporations shared the writer's opinion that the preferred stock issued was void.[2] No offer was made to relinquish rights to the reissued new common stock, nor was mention made of it.

---

[2]The deputy from the office of the Division of Corporations who handled the application for and prepared the permit, called as a witness by appellants, testified that it was not possible to say that the preferred shares were issued in compliance with the permit. He did not say that they were not issued in compliance with the permit.

The commissioner's office informed Topaz that a court action would be necessary to determine "what the status of the stock actually was."

Roberts, on June 25, 1962, and the other appellants, subsequently assigned to one Price their claims for damages based upon the alleged failure of Topaz to deliver preferred stock to them.

The reissued new common shares were escrowed on May 16, 1962; and deposit receipts, dated May 16, 1962, were sent to appellants and other shareholders on August 1, 1962.

Price, on August 7, 1962, commenced action No. 266781 for damages on the assigned claims. Her complaint alleged that the preferred shares were void because issued in violation of the condition that the preferred shares might be issued only after all the new common stock had been issued. Price's action was dismissed by the court on December 21, 1962, because the assignments were not assignments of the shares and the plaintiff, therefore, did not have a cause of action. One of the shareholders whose claim had been assigned to Price and included in that action became one of the plaintiffs in the declaratory relief action.

On January 4, 1963, Price reassigned to appellants whatever rights she had acquired from them.

On November 9, 1962, Topaz, McLoughlin and Campbell commenced action against Roberts for alleged breach of the contracts of March 18, 1960. The action was disposed of by a stipulated judgment entered February 14, 1963, that the contracts "are hereby rescinded, cancelled and rendered of no force and effect upon the parties thereto in any respect whatsoever."

The trial court ruled against appellants (none of whom was a witness) in their eight actions and in the declaratory relief action. It found that, through mistake and inadvertence, the certificates originally issued for the new common stock were not deposited with the escrow holder, but were transmitted to the stockholders (the answer in the declaratory relief action admitted the inadvertent delivery free of escrow) ; that upon discovery of the mistake in July 1961, the corporation requested the shareholders to deliver their common stock certificates to the corporation; that all certificates were delivered; that the corporation then applied for a permit to cancel the certificates that had been recovered back and issue new certificates to be deposited with the escrow holder;

that a permit authorizing that action was issued on April 6, 1962, and the certificates for the reissued new common stock were thereupon made up and deposited with the escrow holder; that it is the appellants' theory that the preferred stock is void, but that the reissue of common stock which they seek to retain as presently issued is valid; that their prayer is for the recovery of the sum of money invested by each of them; that it is untrue that the preferred stock is worthless and of no value; that both preferred and reissued new common stock are valid; that the appellants have not been damaged; and that the reasons no longer exist for the imposition of the escrow provisions and that such provisions should be cancelled. Judgment was entered accordingly.

### Contentions of Appellants

The appellants contend that the preferred stock is void upon the following grounds: That Topaz failed to cancel the old common prior to issuing other securities, as required by the permit; caused the new common to be issued to persons other than McLoughlin and Campbell; failed to escrow the new common as required by the permit; issued preferred shares prior to the time that it had issued all the new common stock authorized to be issued by the permit; and issued preferred securities when the new common stock had not been legally issued.

Inconsistent with their contention that Topaz caused the new common stock to be issued to persons other than Campbell and McLoughlin, appellants, in their reply brief, state that any action brought by them by reason of the common stock would of necessity be directed against McLoughlin and Campbell as individuals who delivered to appellants a portion of their privately-owned stock.

Appellants argue also that they were not *in pari delicto* and that there are no facts present to warrant application of estoppel; that good faith on the part of the respondents does not affect the validity or invalidity of the void stock issue; and that the stock issue, being void, cannot be revitalized by any act or acts subsequent to its issue.

In their closing brief, appellants charge that much irrelevant and immaterial evidence was received over objection, to the extent that such evidence affected the court's judgment. No specifications have been made, and that contention therefore will be disregarded.

## Discussion

Specific findings were not made as to the following matters: (a) Whether the new common originally issued to Roberts' clients was given by McLoughlin and Campbell as a further consideration for the purchase of preferred shares, and whether the issue of preferred and new common to those clients was as to each of the purchasers a single transaction as alleged in the declaratory relief action; (b) whether Roberts was the agent of the other appellants in the stock purchase; (c) whether all of the new common as initially issued was issued before any sale of preferred, or was issued initially by Topaz to persons other than Campbell and McLoughlin, or was issued without the old common's having been cancelled; (d) whether appellants were estopped by reason of their knowing participation in the measures taken to obtain the permit for reissuance of the new common, by their acceptance and by their retention of the reissued new common, from now asserting that the preferred stock is void because of any violation of the permit relating to the new common as originally issued.

While the oral opinion of the trial judge will not supply a deficiency in the findings in that respect, it may be of assistance in determining the basis of the decision.

The oral remarks of the trial judge show that his decision was based upon considerations of fairness, of what is "right and just and proper."

*Was the new common issued for the consideration prescribed by the permit?*

*Was the old common surrendered to Topaz and cancelled before issuance of the new common?*

*Was the new common originally sold or issued to persons other than the holders of the old common?*

The consideration for the new common prescribed by the permit was the prior surrender to Topaz and cancellation of the old. The new common might be issued by the corporation only to holders of the old common.

■ Section 26100, Corporations Code, provides in part: "Every security of its own issue sold or issued by a company with the authorization of the commissioner but which has been sold or issued in nonconformity with any provision in the permit authorizing the issuance or sale of the security is void."

Failure of a corporation to conform with a permit's provi-

sions as to consideration for the specific shares sold, issued or contracted to be sold will render void the sale or contract to sell and issuance of the shares. Thus where the permit requires a sale for cash, sales for other than cash are void, as in an exchange for cancellation of a debt for merchandise (*Reed* v. *Norman,* 41 Cal.2d 17 [256 P.2d 930]), an exchange for a property interest (*Randall* v. *California Land Buyers Syndicate,* 217 Cal. 594 [20 P.2d 331]), a partnership interest (*Mannion* v. *Baldwin,* 217 Cal. 600 [20 P.2d 678]), or an exchange for services (*Strahan* v. *Rodney,* 97 Cal.App.2d 448 [217 P.2d 711]).

Section 26100 makes invalid, also, a sale without a permit therefor made by a corporation of shares previously validly issued to and owned by a shareholder (*Tevis* v. *Blanchard,* 122 Cal.App.2d 731 [266 P.2d 85]); a contract to make such a sale (*Black Point Aggregates, Inc.* v. *Niles Sand & Gravel Co.,* 188 Cal.App.2d 375 [10 Cal.Rptr. 761]); and such a sale under the fictitious guise of a sale of treasury stock (*Castle* v. *Acme Ice Cream Co.,* 101 Cal.App. 94 [281 P. 396]). Such a sale is actively participated in by the corporation when it accepts any portion of the proceeds. (*Tevis* v. *Blanchard, supra,* 122 Cal.App.2d 731, 737.)

However, an ostensible sale by a corporation of shares that have been validly issued to a shareholder without restriction on resale and transferred to the corporation to act as a conduit in their resale to a third person does not require a permit where the resale in fact is made by the original shareholder. (*Crane Valley Land Co.* v. *Bank of America,* 182 Cal.App.2d 166 [5 Cal.Rptr. 731]; *Davies* v. *Acware Plastics,* 116 Cal.App.2d 798 [254 P.2d 663].)

Privately owned shares transferred by the owner as a bonus for the purchase of other shares from the corporation for the cash consideration required by the permit do not invalidate the sale. (*Kent* v. *Kent,* 6 Cal.App.2d 488, 492 [44 P.2d 445].)

The certificates for the old common had not been marked cancelled prior to the original issuance of the new common. Respondents take the position that the old common automatically was cancelled by the filing with the Secretary of State of the certificate of amendment to the articles of incorporation that eliminated the provision for $1.00 common and the substitution therefor of a provision for the nonpar common. They quote the following language from a publica-

tion by the Secretary of State: ". . . the filing by this office of the certificate of amendment automatically, and without the necessity for any further action on the part of the shareholders or the corporation, splits or changes the outstanding shares."

The physical surrender and cancellation of or destruction of certificates of ownership of shares could, however, be of significance. Such certificates, if permitted to remain at large, might be made the instruments of fraud upon members of the investing public. They were not so used in the present instance.

The permit, however, did not specify that the *certificates* should be surrendered; elsewhere the permit uses the phrase, "all documents evidencing any of said securities." The permit, therefore, is ambiguous as to whether it required physical surrender and cancellation of the two certificates for old common, which are "documents evidencing securities," prior to issuance of the new common. Respondents correctly urge that the shares of old common, as distinguished from the certificates evidencing their ownership, were wiped out by the amendment to the articles.

There was no clear and unequivocal violation of the condition of the permit by reason of the failure to cancel physically the certificates for the old common before issuance of the new.

Under the authorities cited, a finding would have been permissible that Topaz did not cause the new common to be issued originally to persons other than the holders of the old common. The minutes of the meeting of the directors indicate that as of March 24, 1960, McLoughlin and Campbell were recognized as the owners of 40,000 shares of common, even though certificates for the ownership of the shares had not been made out. (*Crane Valley Land Co.* v. *Bank of America, supra,* 182 Cal.App.2d 166, 173; *Majors* v. *Girdner,* 31 Cal. App. 47 [159 P. 826].)

The subsequent unauthorized sales by McLoughlin and Campbell of a portion of their holdings were not made by the corporation, which received no part of the consideration.

*What was the effect on the new common of the failure to deposit and hold the certificates in escrow?*

█ The failure to retain the new common shares in escrow was a violation of the conditions of the permit. Sales

of such common shares not held in escrow and, further, made without the required prior approval were void.

The requirement of a permit that shares issued in escrow be held in escrow and not further dealt with except with written consent of the commissioner, if violated by a sale or contract to sell them without such consent, makes void such sale or contract whether made by the corporation (*Tevis* v. *Blanchard, supra,* 122 Cal.App.2d 731; *Black Point Aggregates, Inc.* v. *Niles Sand & Gravel Co., supra,* 188 Cal.App.2d 375), or by the shareholder (*Duntley* v. *Kagarise,* 10 Cal. App.2d 394 [52 P.2d 560]).

*How were the sale and issuance of preferred affected by:*

1. *The manner in which the new common was issued?*

2. *The failure to deposit and retain the new common in escrow?*

█ The preferred was to be sold only after the issuance of the new common in accordance with the terms of the permit.

We have discussed whether the issuance of the new common, as distinguished from the failure to deposit and hold the certificates therefor in escrow, satisfied the conditions of the permit.

A finding would have been permissible that Topaz did not issue preferred shares prior to the issuance of the 40,000 shares of new common to McLoughlin and Campbell, since there is a distinction between issuance of shares and issuance of certificates evidencing ownership of the shares. (*Crane Valley Land Co.* v. *Bank of America, supra,* 182 Cal.App.2d 166, 173.)

By way of interpretation of the permit, we hold that the failure to cancel physically the old common certificates, as distinguished from the shares themselves, before issuance of the new, did not invalidate the sale and issuance of the preferred stock.

The question arises whether a violation of the escrow conditions of the permit as to the new common shares should render void the sale and issuance of preferred stock which was sold for the price, in the manner and to the persons authorized by the permit and was deposited and held in escrow as required by the permit.

The permit does not state that sales of preferred were to be

made only after the deposit in escrow of certificates for the new common shares.

It is only if such deposit were a condition precedent to the sale of any preferred shares that the failure to deposit and retain in escrow the certificates for new common would affect the validity of the preferred.

■ The void sale or issuance of certain shares made in violation of the terms of the permit under which they were issued does not invalidate the sale of other shares of the same issue made in compliance with the requirements of the permit (*Kent* v. *Kent, supra,* 6 Cal.App.2d 488, 492-493),[3] even when the shares issued in violation of the permit were issued as a part of the same transaction and represented by the same certificate as the shares sold in compliance with the permit (*Reed* v. *Norman, supra,* 41 Cal.2d 17).

■ In considering whether the issuance and retention in escrow of the new common shares were intended to be conditions precedent to the sale of any preferred shares, it is necessary to point out that the permit called for not only a deposit in escrow, but forbade the sale of any of the escrowed shares without written consent. A sale of escrowed shares, made without written consent, would be a void transaction, but would not serve to render void ex post facto the original valid issuance of the shares so sold, or of other shares not so sold; nor would the subsequent release of validly issued shares from escrow without the permission of the commissioner render such shares void.

Such a condition precedent can result only from a strained interpretation of the permit, based upon the argument that if the preferred might be sold only after the new common had been issued, and that if "when issued," all documents evidencing the new common must be forthwith deposited with the escrow holder, no sufficient time could intervene between issuance and deposit for the sale of the preferred.

No reason appears for such a forced interpretation of the language of the permit. The permit states specifically that

---

. [3]Decided under the Corporate Securities Act as it was prior to the amendments of 1931. Section 12 of the Corporate Securities Act then read: "Every security issued by any company, without a permit of the commissioner authorizing the same then in effect, shall be void, and every security issued by any company, with the authorization of the commissioner but not conforming in its provisions to the provisions, if any, which it is required by the permit of the commissioner to contain, shall be void."

*"after* applicant shall have sold, received the consideration for and issued" the authorized new common, Topaz is authorized to sell and issue its preferred stock. (Italics added.)

In imposing the escrow conditions, the permit states that none of the securities shall be sold until Topaz *"first* shall have selected an escrow holder" who shall have been *"first* approved in writing."* (Italics added.)

The permit does not say, however, that none of the preferred shares shall be sold or issued unless the common stock shall *first* have been deposited in escrow.

Although the deposit in escrow is stated to be a condition upon which the permit is issued, paragraph (c) of the permit does not specifically make the deposit in escrow of share certificates that have been issued a condition precedent to the issuance of other shares. The permit is at best ambiguous as to whether the deposit and retention in escrow of the new common shares are conditions precedent to the valid issuance of the preferred shares.

Even if the permit be interpreted to impose such condition precedent, compliance with the conditions of the permit by the issuance of the new common stock and its deposit forthwith with the escrow holder might leave an intervening period during which preferred shares might be issued. The term "forthwith" is not in law to be necessarily construed as a time immediately succeeding without an interval. (*Newlove* v. *Mercantile Trust Co.,* 156 Cal. 657, 666 [105.P. 971].)

If the validity of the issuance of the preferred stock was inextricably bound up with the requirement that certificates for the new common be forthwith deposited in escrow, it would have been possible, under the theory just discussed, that some of the preferred shares were validly issued and others not. If once validly issued, a subsequent violation of the escrow condition as to the common stock would not render invalid what had been validly issued.

If the language of a permit imposing conditions is ambiguous, the court will interpret it. (*Christy* v. *Oakland Title Ins. & Guar. Co.,* 132 Cal.App. 315, 321 [22 P.2d 737].)

A substantial compliance with the conditions of the permit is all that is required. (*Moore* v. *Moffatt,* 188 Cal. 1, 7

[204 P. 220]; *Christy* v. *Oakland Title Ins. & Guar. Co.,* *supra,* 132 Cal.App. 315, 323.)

The question of whether an uncertainty or ambiguity exists is one of law and the lower court's finding on this issue is not binding on appeal. (*Wachs* v. *Wachs,* 11 Cal.2d 322, 325 [79 P.2d 1085]; *Brant* v. *California Dairies, Inc.,* 4 Cal.2d 128, 133 [48 P.2d 13].)

The legal effect of written documents is a question of law where there is no qualifying testimony, and in such case the interpretation given to them by the trial court is not binding upon the appellate court whose duty it is to make the final determination in accordance with the applicable principles of law. (*Meyer* v. *State Board of Equalization,* 42 Cal.2d 376, 381 [267 P.2d 257]; *Continental Mfg. Corp.* v. *Underwriters at Lloyds London,* 185 Cal.App.2d 545, 548 [8 Cal. Rptr. 276, 9 Cal.Rptr. 115].)

Although the trial court did not purport in its conclusions of law to interpret the language of the permit, this court under the authorities cited may do so.

We conclude that the permit did not make the deposit or retention in escrow of new common share certificates a condition precedent to the sale of preferred.

*Did the permit of April 6, 1962, have any effect to cure any invalidity of either preferred or common shares?*

In general, an agreement by a corporation to sell shares, before a permit has been obtained, is not aided by the issuance of a permit thereafter (*Bourke* v. *Frisk,* 92 Cal. App.2d 23 [206 P.2d 407]); and is not cured by the good faith of the seller (*El Claro Oil etc. Co.* v. *Daugherty,* 11 Cal.App.2d 274 [53 P.2d 1028, 55 P.2d 488]).[4]

The invalidity of a sale by the owner of escrowed stock in violation of a requirement that a further permit first be obtained will not be cured by a subsequent consent to the transfer obtained by the seller without the knowledge of the buyer, nor by a consent to transfer to a third person obtained by the buyer in ignorance of the seller's failure to obtain the permit for the original sale, where the rights of third parties do not intervene. (*Duntley* v. *Kagarise, supra,* 10 Cal.App.2d 394.)

---

[4] A good faith belief that a permit is unnecessary sometimes may be material in a criminal prosecution for a violation of the act. (*People* v. *Ferguson,* 134 Cal.App. 41 [24 P.2d 965].)

■ However, the Commissioner of Corporations has continuing power in proceedings for a permit to issue shares, which extends to the granting of a permit to issue stock to persons who held stock illegally issued and who were willing to purchase other stock for the price of the illegally issued shares if a permit could be obtained, and to impose conditions upon the granting of such permit. (*Basalt Rock Co., Inc.* v. *MacMillan*, 80 Cal.App. 147 [251 P. 322].)

Exercise of such continuing power to amend a permit to impose new conditions upon the issuance of shares is not prevented by the fact that a substantial part of the stock authorized to be sold under the original permit has been sold prior to the amendment. (*Crestlawn Memorial Park Assn.* v. *Sobieski*, 210 Cal.App.2d 43 [26 Cal.Rptr. 421].)

The permit of April 6 had no retroactive effect to make valid any issuance or transfer of shares in violation of the terms of the permit of March 4, 1960.

*Is there room for application of the doctrine of estoppel?*

■ ■ The general rule is that the doctrine of estoppel has no application where shares have been issued in violation of the terms of a permit or without a permit (*Walker* v. *Harbor Realty etc. Corp.*, 214 Cal. 46 [3 P.2d 557]), and estoppel cannot ordinarily be invoked to give validity to a contract that is void through violation of law (*Regan* v. *Albin*, 219 Cal. 357, 360 [26 P.2d 475]).

■ Since sales, made without a permit therefor, of shares of its own issue by a corporation, or sales made by anyone in violation of the terms of the permit under which the shares were issued, are void, the purchaser may recover the purchase price (*Walker* v. *Harbor Realty etc. Corp., supra*, 214 Cal. 46) ; the sale furnishes no consideration for a note given for the purchase (*Duntley* v. *Kagarise, supra*, 10 Cal.App.2d 394) ; deprives of valid consideration an agreement to pay a commission on the sale to a securities broker who has knowledge of the facts that make the sale illegal (*Perego* v. *Seymour*, 196 Cal.App.2d 773 [16 Cal.Rptr. 831]) ; and one promised a commission by a corporation for an unauthorized sale of securities to a third person may not recover the purchase price advanced by him to facilitate such sale (*Campbell* v. *Julian Merger Mines*, 111 Cal.App. 649 [295 P. 1040]).

■ Nevertheless, where the plaintiff purchaser of shares

issued in violation of the terms of the permit seeks equitable relief, equitable principles may bar his recovery. (*Domenigoni* v. *Imperial Live Stock etc. Co.*, 189 Cal. 467 [209 P. 36].)

If circumstances justify a finding that a new and independent contract has been made after the issuance of a permit, and the subscriber then accepts a certificate for shares, payment for which was made before organization of the corporation, the shareholder may not recover such purchase price, although it might have been recovered at any time prior to the acceptance of the stock. (*Waring* v. *Pitcher*, 135 Cal.App. 493 [27 P.2d 397]; see also *Moore* v. *Moffatt*, *supra*, 188 Cal. 1.)

■ If the purchaser has received anything of value, he must tender its return. (*Tevis* v. *Blanchard*, *supra*, 122 Cal. App.2d 731, 738.)

■ Recovery of the purchase price of shares paid before a permit for the sale was obtained may be barred by circumstances amounting to laches or where the plaintiff was *in pari delicto*. (*Miller* v. *California Roofing Co.*, 55 Cal.App.2d 136, 145 [130 P.2d 740].)

An agreement to issue shares without obtaining a permit may be equitably enforced in favor of a purchaser by a decree of the court that application for a permit be made and shares issued in certain proportions in accordance with the permit; the shares so issued are valid (*Ray* v. *Freeman*, 37 Cal.App.2d 656, 662 [100 P.2d 332]); and in a proper case, where equitable principles favor it, an agreement made in advance of the obtaining of a permit, to have corporate stock issued under a permit to one person, who would then divide it with others, may be enforced (*Rankin* v. *Bankey*, 196 Cal. App.2d 554 [16 Cal.Rptr. 721]); and a purchaser acting in good faith may obtain enforcement of a contract for the sale of escrowed shares made in advance of the obtaining of a permit for the transfer where the sale was not consummated before the permit issued and the condition of the escrow was that no sale be consummated without a permit. (*Kaneko* v. *Okuda*, 195 Cal.App.2d 217, 232 [15 Cal.Rptr. 792].)

It is clear that equitable principles have never been absent from consideration in the decisions of the courts. Whether equitable principles governed the decision of the trial court in the present case does not appear from the findings.

■ One who resists a shareholder's action to recover the purchase price of shares illegally issued cannot rely on a claim of estoppel unless facts have been pleaded to give rise

to that defense (*Reed* v. *Norman, supra,* 41 Cal.2d 17, 21-22) in accord with the general rule that such facts must be pleaded if there is an opportunity to do so. (*Phoenix Mutual L. Ins. Co.* v. *Birkelund,* 29 Cal.2d 352, 363 [175 P.2d 5]; see also *Lucci* v. *United Credit & Collection Co.,* 220 Cal. 492, 497 [31 P.2d 369]; *Victor Oil Co.* v. *Drumm,* 184 Cal. 226, 243 [193 P. 243]; *Mahana* v. *Echo Publishing Co.,* 181 Cal. 233, 236 [183 P. 800]; *Newhall* v. *Hatch,* 134 Cal. 269, 273 [66 P. 266, 55 L.R.A. 673].)

Such rule does not apply where the facts appear on the face of the adversary's pleading. (*Victor Oil Co.* v. *Drumm, supra,* 184 Cal. 226, 243; *Phoenix Mutual L. Ins. Co.* v. *Birkclund, supra,* 29 Cal.2d 352, 363.)

■ The pleadings in action No. 273044 may properly be considered even though no separate appeal was taken in that action. (See *Clinton* v. *Hogan,* 80 Cal.App.2d 815, 822 [183 P.2d 50], where a second set of findings made in one of two consolidated actions was brought up by the court of appeal to supply a defect in the set of findings made in the other action in which the appeal was taken.)

Where an issue affects the rights of all the parties, its presentation in any of the complaints becomes an issue in the consolidated action. (*Union Lumber Co.* v. *Simon,* 150 Cal. 751, 762 [89 P. 1077, 1081].)

■ If there are facts constituting estoppel that appear from the complaint for declaratory relief or in the answer thereto, such pleading would be sufficient to satisfy the rule that an estoppel must be pleaded.

Among the issues stated by the pretrial order are these: "If the original issue was in any respect, void, voidable, or technically deficient, was such deficiency remedied by the subsequent action of the corporation's stockholders, escrow holder and the Division of Corporations?

"If the individual plaintiffs are entitled to relief, what is the nature and extent of that relief, and can they retain their stock, common and/or preferred, and obtain damages?

". . . . . . . . . . . .

"A determination by the court of whether the common and/or preferred stock issued by the plaintiff corporation to its respective shareholders is under all the circumstances valid, or void or voidable."

The complaint in declaratory relief alleges and the answer admits "the issuance of preferred and common stock cer-

tificates; the escrowing of the preferred and the inadvertent delivery of the common certificates free of escrow; the recovery back of the common stock certificates by the corporation; the obtaining of a Permit authorizing issuance of new common stock certificates in escrow; and the issuance of the new certificates in escrow and delivery of appropriate escrow receipts.''

The complaint alleges further that Roberts acted on behalf of the prospective investors in the preferred stock; that the issuance of the new common out of escrow and the preferred was part of the same transaction; that the appellants who owned both preferred and common stock demanded that they be paid damages in twice the sum actually invested by them while they continue to hold their common stock.

The pleadings taken as a whole form a framework for the application of the doctrine of estoppel. The circumstances here permit the application of that principle. The first claim of appellants was made six days after the commissioner had granted the permit for the reissued new common; the action on the claims assigned to Price was commenced 11 days after receipts for the reissued new common had actually been mailed to the shareholders.

Appellants knowingly and willfully took part in a series of events by which the issuance to them of the new common was regularized; they seek to and do retain the benefit of the original issue to them of those shares, thus regularized, while at the same time they would recover the consideration paid for the preferred shares, the validity of which they attack upon the ground of the original invalid issue of the now validly issued common shares they have retained. The validation of those shares in the manner in which it was done, and their retention in the perspective of the sequence of events that followed, furnishes material for a finding of estoppel.

The oral decision of the trial court indicates that he was motivated by considerations of equity and fair dealing. He also indicated that he believed Roberts acted on behalf of the other appellants in the entire transaction and that the purported agreement to sell 5,000 shares of common for two cents was a cloak to disguise an unjust exaction. He did not say whether he drew any inference from the assumed fact that Roberts was at once broker for his fellow appellants and adviser of Topaz as to ''marketing of securities.'' It might reasonably have been inferred that a securities broker retained to give such advice was familiar with the terms of the

permit, and was himself a participant in the illegal delivery out of escrow of the certificates for common shares delivered to his clients.

The permissibility of such an inference would not be destroyed by the subsequent stipulated judgment of rescission of the March 18 agreement.

It is appropriate, therefore, that the judgment be and it is reversed and the cause remanded to the trial court to make findings on the following matters of fact:

1. Whether the new common originally issued to Roberts and each of its clients was given by McLoughlin and Campbell as a further consideration for the purchase of preferred shares.

2. Whether such new common was demanded and received by the purchasers of preferred as such additional consideration so as to make the purchase of preferred and the receipt of new common by each such purchaser a single transaction.

3. Whether Roberts was the agent of the other appellants in the stock purchase.

4. Whether the 40,000 shares of new common as originally issued were issued before any sale of preferred, or were issued initially by Topaz to persons other than Campbell and McLoughlin.

5. Whether appellants were estopped by reason of their knowing participation in the measures taken to obtain the permit for reissuance of the new common, by their acceptance and by their retention of the reissued new common, from now asserting that the preferred stock is void because of any violation of the permit relating to the new common as originally issued.

Upon the making of such findings, judgment should be entered in harmony with the views expressed in this opinion.

Respondents are to recover their costs on appeal.

Brown (Gerald), P. J., and Coughlin, J., concurred.